IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MICHAEL L. SHIPLEY,**

    **Petitioner,**

    v.

**TERRY A. TIBBALS,**
**WARDEN,**

    **Respondent.**

CASE NO. 2:15-cv-631
JUDGE MICHAEL H. WATSON
MAGISTRATE JUDGE KEMP

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the petition (Doc. 1), the return of writ (Doc. 6), Petitioner's traverse (Doc. 8), the reply to the traverse (Doc. 9), and the associated exhibits. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the petition be **DENIED** and that this case be **DISMISSED**.

### I. Procedural History

On November 8, 2011, the Franklin County, Ohio grand jury returned a ten-count indictment charging Petitioner with burglary and theft. *Return of Writ*, Exhibit 2. The indictment described offenses which occurred on two different dates - August 21, 2011, and August 28, 2011. A co-defendant, Crystal Galloway, was also indicted on these charges.

Petitioner pleaded not guilty and the case was tried to a jury. The jury convicted Petitioner on eight separate counts.. *Return*, Ex. 6. On April 18, 2012, the trial court

sentenced Petitioner to a total of twelve years of imprisonment. *Return*, Ex. 7. He was also ordered to make restitution and to serve a term of post-release control.

Through counsel, Petitioner appealed his conviction to the Tenth District Court of Appeals. In his appellate brief, Petitioner raised three assignments of error: (1) the trial court erred in overruling his motion for judgment of acquittal; (2) the trial court erred in admitting "other acts" evidence relating to a separate and distinct criminal conviction; and (3) the convictions were against the manifest weight of the evidence;. *Return,* Ex. 10. In a decision rendered on September 19, 2013, the court of appeals overruled each of Petitioner's assignments of error and affirmed his convictions. *State v. Shipley*, 2013 WL 5308695 (Franklin Co. App. Sept. 19, 2013).

Through counsel, Petitioner filed an appeal to the Ohio Supreme Court. He raised two propositions of law: that a person who commits a crime while present on publicly open land does not become a trespasser, and the privilege of members of the public to enter and remain upon land is not vitiated by acts of deception taken in furtherance of the commission of a criminal offense. *Return,* Ex. 18. The Ohio Supreme Court declined to consider the appeal, *State v. Shipley,* 138 Ohio St.3d 1415 (Feb. 19, 2014), and also denied a motion to reconsider that decision. *State v. Shipley*, 138 Ohio St.3d 1472 (Apr. 23, 2014).

On February 18, 2015, Petitioner filed his petition for a writ of habeas corpus with this court. The petition appears to have been signed as early as February 13, 2015. Petitioner asserts three grounds for relief, which he states (in these words) as follows:

**GROUND ONE**: Petitioner was denied right to a fair trial, and Equal Protection in violation of his Constitutional Rights provided with the Sixth and Fourteenth Amendment{s} to the United States Constitution.

**GROUND TWO**: Petitioner was denied Equal Protection of the Law and Due Process when the trial court erred in admitting other "acts" evidence relating to a separate and distinct criminal conviction, denying Petitioner right to a fair trial pursuant to State and Federal constitution.

**GROUND THREE**: Petitioner was denied his Constitutional Right to Due Process and a Fair Trial based on the Evidence being against the Manifest weight of the Evidence in this case.

Respondent asserts that all of these claims were procedurally defaulted because Petitioner did not raise them in his appeal to the Ohio Supreme Court. Respondent also argues that these grounds are either without merit or not cognizable in federal habeas corpus. In his traverse, Petitioner contends that his propositions of law presented to the Ohio Supreme Court did raise the issue of insufficient evidence as to the burglary counts, and also demonstrate that he was actually innocent of any burglaries.

## II. The Facts

The Court begins by reciting the facts as they were set out in the state court of appeals opinion. In its summary of the evidence introduced at trial, that court said:

> The following evidence was adduced from the state's case-in-chief. On August 21, 2011, realtor Tom Amicon held an open house for homeowners Kelly and Sean Edgell at the location of 3945 Dinon Drive. The open house took place between 2:00 and 4:00 p.m. Amicon testified that only two individuals viewed the home, appellant and Crystal Galloway, at approximately 3:00 p.m. Appellant and Galloway entered the home, and, according to Amicon, appellant immediately engaged him in conversation, while Galloway went directly into the bedroom. Amicon

testified that appellant instructed him "[d]on't look at her" because her mother had just died, and she could begin to cry at any minute. (Tr. 135.) According to Amicon, appellant explained he brought Galloway to look at houses because she was having a tough day.

Amicon testified that he was concerned because appellant engaged him in unusual conversation having nothing to do with the home while Galloway was out of sight. Once Galloway came out of the bedroom, the couple made a hasty exit. The next morning, Amicon was contacted by Kelly Edgell, who informed him some of their jewelry was missing. Edgell testified approximately $600 worth of jewelry was taken. Amicon called the police and placed an alert on a realtor's website, at which time he learned another home had been "hit." (Tr.145.) Both Amicon and Edgell testified appellant and Galloway did not have permission to enter the home for the purpose of taking personal belongings from the home.

Also on August 21, 2011, realtor Annette Marble held an open house for homeowners David and Tracey Griffis at the location of 4401 Kathryns Way. The open house took place between 2:00 and 4:00 p.m. Marble testified that, at approximately 3:45 p.m., as she was closing the open house, a dark truck pulled up and its occupants, Galloway and appellant, asked if they "still had the open house." (Tr. 220.) At about that same time, the homeowners arrived back at the home. Marble checked with them to see if she could show the arriving couple the home. They answered in the affirmative and left.

Marble let both Galloway and appellant into the home. Marble testified the female immediately went upstairs, and appellant began discussing how Galloway's mom had just died and "not to look at her because she'll cry and she was really upset." (Tr. 224.) Marble testified that appellant stated, because of the mother's death, they could now afford a home. According to Marble, the conversation continued until appellant's phone rang, at which point Marble thought to check on Galloway. According to Marble, as she moved toward the foyer, appellant began to ask more questions about the house, pulling her attention back into the family room. Appellant's phone rang a second time when Marble observed Galloway exit the master bedroom, closing the door behind her. Appellant and Galloway then left the premises.

-4-

When the homeowners pulled up to the home, Marble, suspecting something was amiss, asked if they had anything of value in the home. Tracey Griffis testified that her husband ran up to the master bedroom and discovered their jewelry, valued at approximately $7,000, was gone. She further testified that appellant was one of the individuals she saw enter her home on August 21, 2011. Both Marble and Tracey Griffis testified appellant and Galloway did not have permission to enter the home for the purpose of taking any personal property.

The third incident occurred on August 28, 2011, when realtor Sandy Clapham held an open house for homeowners Ryan and Erin Arens, at the location of 6226 Kendall Ridge Boulevard. The open house occurred between 1:00 and 3:00 p.m. Clapham testified she had placed signs up around the neighborhood denoting the home had a first floor master bedroom. According to Clapham, appellant and Galloway entered the home, and appellant immediately stated "I want you to show me the basement, and she wants to see the master bedroom ." (Tr. 283.) Clapham testified that she informed the couple the master bedroom was to the right, and Galloway headed directly to it. According to Clapham, appellant asked "more than twice" to see the basement. (Tr. 286.) However, Clapham testified she was afraid to go into the basement alone with appellant so she ignored the request and retreated to the kitchen, which had multiple exits and access to her cell phone. Clapham described appellant as being "in [her] face" as she retreated. (Tr. 288.)

According to Clapham, appellant stated he was taking Galloway to look at homes because her mother had just died, and she was having emotional difficulties, which included bouts of crying. Appellant continued to talk about Galloway, and, at one point, Clapham attempted to move out of the kitchen. Appellant sidestepped her, placed himself in the doorway to the master bedroom, and spread his legs and arms apart. According to Clapham, appellant completely obstructed her view into the master bedroom for "[a] few minutes." (Tr. 295.)

Clapham again retreated into the kitchen and appellant followed. Clapham testified appellant continued to converse with her while Galloway headed up the stairs. After some time, Clapham stated she became "restless," and appellant went to the stairs and yelled up to

Galloway. (Tr. 296.) According to Clapham, she attempted to seize on this "break," grabbed her phone and purse, and moved towards the front door to exit. (Tr. 297.) However, just as Clapham began to leave, appellant questioned her on where she was heading and followed her outside. Clapham stated, upon exiting the home, a neighbor engaged appellant in conversation. Clapham then saw appellant's vehicle, a black Dodge Ram, and memorized the license plate number because she believed something unusual was going on. Clapham then re-entered the home, while appellant was still engaged in conversation with the neighbor and wrote down the license plate number. According to Clapham, she called her office to describe what happened, sent a text to the Arens's to come home, and then called the police and provided the license plate number.

Erin Arens, the homeowner, testified she returned home immediately after receiving a voicemail from the realtor and began to check the home for missing items. According to Arens, she immediately noticed watches were missing from the master bedroom, as well as prescription medicine from the master bath. A few days later, Arens noticed more items missing and testified the total value of the missing items was between $800 and $1,000. Both Clapham and Arens testified appellant and Galloway did not have permission to enter the home for the purpose of taking personal property from the home.

The fourth incident also occurred on August 28, 2011. Realtor Bryan Harrison held an open house for homeowners James and Patricia Deuschle at the location of 4264 Wyandotte Woods between 2:00 and 4:00 p.m. Harrison testified the purpose of an open house is to "bring in people that might have an interest in the home." (Tr. 174.) Harrison stated before the open house began, he accessed the "Columbus Board of Realtors' MLS" website and checked the "alert" section. (Tr. 175.) Although he noticed an alert, which made him wary, he continued to prepare for the open house. Shortly after 2:00 p.m., Harrison testified appellant and Galloway arrived at the home, and he believed they matched the description provided in the alert. According to Harrison, Galloway and appellant entered the home, and Galloway headed straight up the stairs while appellant engaged Harrison in conversation. Harrison testified appellant told him Galloway had recently lost her father and was looking to buy a house.

Harrison stated none of the Deuschle's property was upstairs because those bedrooms were not in use, so he did not follow Galloway upstairs. According to Harrison, Galloway came downstairs and headed directly to the master bedroom, and this time he followed. Harrison stated he began to ask Galloway "open-ended questions" about the home, and she gave only one-word answers. (Tr. 182.) The couple then left the home, and Harrison wrote down the license plate number, a description of their vehicle, and then called the police and the Deuschle's.

According to James Deuschle, after receiving a phone call from Harrison, he returned home. Deuschle checked the house and no property was missing. Both Harrison and Deuschle testified appellant and Galloway did not have permission to enter the home for the purpose of taking personal property from the home.

The fifth incident, again, occurred on August 28, 2011. Realtor Lynn Elledge held an open house for homeowners Jason and Jennifer Rees at the location of 3900 Man O' War Court, between the hours of 2:00 and 4:00 p.m. According to Elledge, appellant and Galloway entered the home, and Galloway immediately went upstairs while appellant engaged him in conversation. Elledge testified that appellant told him Galloway's mother had just died and they were looking for a house for her kids. Elledge stated he asked appellant if they were buying the house together, and appellant stated "No. I work for her." (Tr. 252.)

According to Elledge, because it was a small house, he became concerned when Galloway was upstairs for such a long period of time and left a note for the Rees's to check their personal belongings upstairs. Elledge received a phone call from the homeowners telling him items were missing. Elledge called his broker and the following Monday called the police.

Jennifer Rees testified that, after she arrived home and read the note from her realtor telling her to check her personal belongings, she went upstairs and checked her jewelry she had hidden, only to discover it was missing. Rees testified the value of the stolen jewelry was over $5,000. Both Elledge and Rees testified neither appellant nor Galloway had permission to enter the home for the purpose of taking personal property.

*State v. Shipley*, 2013 WL 5308695, *1-4.

### III. Procedural Default

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. §2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6, 103 (1982 (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas...." *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494,

497 (6th Cir. 1987)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. In the words used by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case-that is, they are "procedurally defaulted."

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional

error.  *Id*.  This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level.  *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985). Turning to the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  In order to constitute cause, an ineffective assistance of counsel claim generally must " 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.' " *Edwards,* 529 U.S. at 452 (quoting *Murray v. Carrier*, 477 U.S. 478, 479 (1986)). That is because, before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted."  *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005). Or, if procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000). The Supreme Court explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in *Coleman*: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640. We again

-10-

> considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to " 'protect the integrity' of the federal exhaustion rule." *Id.*, at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (quoting id., at 853, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by " 'letting the time run' " so that state remedies were no longer available. *Id.*, at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].' " *Id.*, at 854, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 (1950)).

*Edwards*, 529 U.S. at 452–53.

If, after considering all four factors of the *Maupin* test, the court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)).

Respondent asserts that none of the three ground raised in the federal habeas corpus petition were presented to the Ohio Supreme Court, nor were any federal

-11-

constitutional claims raised in that appeal.  As the Court reads Petitioner's response, he does not argue that his claim about the admission of "other acts" evidence was presented to the Ohio Supreme Court, nor does he make a colorable argument that this failure was excusable.  As to his first and third claims, however, he notes that the centerpiece of his sufficiency of the evidence argument was the lack of evidence that the crimes in question were burglaries due to the fact that the premises were all open to the public, and a person who has permission to enter the property does not become a trespasser just because the person's intent when entering was to commit a crime.  Since the commission of a trespass is a prerequisite to the commission of a burglary, Petitioner argues that the propositions of law he presented to the Ohio Supreme Court were simply a different way of raising a sufficiency of the evidence challenge - and even if they were not, they demonstrate that he is actually innocent of the burglary charges, which innocence would excuse his procedural default.

Petitioner is correct that his sufficiency of the evidence claim in the state courts was that he could not have committed a trespass since the homes from which items were stolen were all open to the public.  As the state court of appeals observed, "[t]he focus of appellant's sufficiency argument is the 'trespass' element of burglary." *State v. Shipley, supra,* at *6.  Rather than determine if Petitioner preserved that claim as a federal constitutional claim by arguing to the Ohio Supreme Court that the trespass element was not satisfied, the Court chooses to reach the merits of this claim.  It will address only the sufficiency of the evidence claim, however, since the evidentiary claim (ground two) was clearly defaulted, and the claim that the verdicts were against the manifest

weight of the evidence (ground three) is purely a state law claim which cannot form the basis for federal habeas corpus relief. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983).

### IV.  Sufficiency of the Evidence

#### A.  The AEDPA

A state prisoner's claims for habeas corpus relief are governed by the Antiterrorism and Effective Death Penalty Act of 1995 (the AEDPA), which amended the habeas corpus statute by including a standard of review that gives significant deference to the decisions made by the state courts on the constitutional issues raised in a habeas corpus petition. As this Court has said, the provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. 104–132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v. Johnson,* 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding

In applying this statute, the Supreme Court has held that "[t]he focus ... is on whether the state court's application of clearly established federal law is objectively unreasonable ... an unreasonable application is different from an incorrect one." To obtain habeas corpus relief, a petitioner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, --- U.S. ----, ----, 132 S.Ct. 26, 27 (2011), quoting *Harrington v. Richter*, 562 U.S. ----, ----, 131 S.Ct. 770, 786–8 (2011). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S.Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 50 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.*, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

**B. Review of the State Court Decision**

The starting point of the Court's analysis is the state court of appeals decision. As noted, under the AEDPA, it is that decision which must be analyzed to determine whether it is contrary to, or an unreasonable application of, clearly established federal law.  For the following reasons, the Court cannot reach that conclusion.

The state court determined, as a matter of Ohio law, that when entry to a private home is gained through deceit, a trespass has occurred, stating in *Shipley, supra,* at *7:

> [W]e find this court's decision in *In re Meachem*, 10th Dist. No. 01AP1122, 2002–Ohio–2243, instructive on the issue of whether appellant had a privilege to be on the property such that he could not have committed a trespass and, therefore, not committed a burglary. The defendant in *Meachem*, pursued by police officers, sought refuge in a nearby home and used deception to gain entry. In *Meachem*, we stated, "pursuant to R.C. 2911.12(C), '[i]t is no defense to a charge under this section that the offender was authorized to enter or remain on the land or premises involved, when such authorization was secured by deception.' " *Id*. at ¶ 17. We further stated:
>
>> "Deception" means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.
>
> *Id*. at ¶ 18, citing R.C. 2913.01(A). "In order to be guilty of a criminal trespass through deception, a defendant must be aware either that a false impression is created or perpetuated or, knowing that the victim holds a false impression, withholds or prevents the victim from obtaining information to the contrary." *Id*. at ¶ 19, citing *Mayfield Hts. v. Riddle*, 108 Ohio App .3d, 341–42 (8th Dist.1995); *see also In Re J.M.*, 7th Dist. No. 12 JE 3, 2012–Ohio–5283.

The state court also concluded that there was sufficient evidence that Petitioner feigned interest in purchasing each home and withheld information from the realtor, so that the element of deceit was met. Petitioner's counter-argument in the state court, which he repeats here, is that as long as a residence is open to the public, it does not matter with what state of mind someone enters it; what matters is that every member of the public, including those who have a predetermined intent to commit a crime on the premises, is privileged to enter and remain on the premises once property is made open to the general public.

It is important to stress, at the outset, that this Court lacks the power to reach its own conclusion about what the word "trespass" means under Ohio law. In other words, this Court is bound by Ohio's interpretation of its own statutes, and there is generally no federal constitutional issue posed by such interpretations, even if they are interpretations that this Court or other courts might not agree with. *See Warner v. Zent*, 997 F.2d 116, 133 (6th Cir. 1993)("On habeas review, we are bound by state court interpretations of state criminal law except in extreme circumstances where it appears that the interpretation is an obvious subterfuge to evade consideration of a federal issue"). Further, "[a] state is free within extremely broad limits to decide upon the elements of a crime." *Eaglin v. Welborn*, 57 F.3d 496, 500 (7th Cir. 1995). And it should be noted that, here, although Petitioner presented a sufficiency of the evidence argument based on the contention that what he did was not a trespass as defined under Ohio law, he did not argue that Ohio was prevented by the federal constitution from defining "trespass" to include the type of conduct he engaged in.

Unfortunately for Petitioner, the posture of this case precludes any federal habeas corpus relief. As the Tenth District Court of Appeals defined trespass - that is, entry onto property open to the public by a person who has criminal conduct in mind - there was enough evidence to show that Petitioner did exactly that. Even if there were not, for this Court to grant relief, it would have to find that the state appellate court unreasonably determined that the evidence was sufficient to meet its definition of trespass. However, under the AEDPA and other applicable law, the deference due to state courts on this issue is essentially two levels of deference, one for the jury's decision and the second for the appellate court's decision. *See Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Given that deference, this Court concludes that both a reasonable jury and a reasonable state court could have found that the evidence presented - more fully described in the recital of facts from the state appeals court's decision - was sufficient; that is, as that court said, "[w]hen viewing the evidence in a light most favorable to the state, a reasonable jury could conclude appellant deceived the realtors by both withholding information and feigning interest in the homes such that he committed a trespass." *State v. Shipley*, 2013 WL 5308695, *8. Consequently, ground one is without merit.

## V. Recommendation

For all of the reasons stated above, it is recommended that the petition for a writ of habeas corpus be **DENIED** and this action be **DISMISSED.**

## VI. Procedure on Objections

-17-

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge